SUSANA DE LA FUENTE BENÍQUEZ ET AL., demandantes y apelantes, *v.* ANTONIO ROIG SUCRS., S. EN C., demandada y apelada.

Número 11737.

*Sometido:* 11 de diciembre de 1957. *Resuelto:* 2 de mayo de 1961.

516

*Octavio Jiménez, Miguel Marcos Contreras y Pablo Defendini,* abogados de los apelantes; *F. González, Jr.,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal

En este pleito(¹) el tribunal de instancia hizo las siguientes conclusiones sobre la prueba:

---

(¹) Aunque la demanda en este pleito fue titulada "Negatoria de Servidumbre y Daños y Perjuicios", las alegaciones y la prueba demuestran claramente que no existe cuestión alguna de servidumbre en su sentido estricto, y sí exclusivamente cuestiones relativas a las relaciones entre ciertos condóminos. Nuestro Código Civil en su art. 465 (31 L.P.R.A.

"1. Que Susana de la Fuente Beníquez y Antonio Roig Sucesores, S. en C., son dueñas en común proindiviso de un predio de terreno radicado en el barrio Juan Martín de Yabucoa compuesto de 111.60 cuerdas correspondiendo a Susana de la Fuente Beníquez una participación indivisa de 98.35 cuerdas y a Antonio Roig Sucesores, S. en C., una participación indivisa de 13.25 cuerdas.

"2. Que en virtud de la escritura Núm. 28 otorgada en 7 de abril de 1932 ante el Notario Francisco González Fagundo, doña Susana de la Fuente Beníquez dio en arrendamiento a The Yabucoa Sugar Co. su participación indivisa en la finca de 111.60 cuerdas por un término de seis años, cuatro meses, a contar desde el primero de marzo de 1937 con opción a una prórroga de un año más, habiendo sido sucedida The Yabucoa Sugar Co. por derecho de subrogación en el referido arrendamiento por Antonio Roig Sucesores, S. en C., según rescisión de contrato convenido entre las partes y consumado por la escritura Núm. 93 otorgada ante el Notario Francisco González, Jr. en 6 de junio de 1947, disfrutando Antonio Roig Sucesores de dicho arrendamiento hasta el 30 de junio de 1947.

"3. Que por escritura otorgada el 22 de marzo de 1951 ante el Notario Miguel Marcos Contreras, don Rafael Pérez de la Fuente como fiduciario recibió un interés representado por un fideicomiso de $5,000 en el valor de la participación correspondiente a la demandante Susana de la Fuente Beníquez para Annette Pérez de la Fuente Ortiz y Vannessa Pérez de la Fuente Ortiz.

"4. Que sobre la finca de 111.60 cuerdas situada en el barrio Juan Martín de Yabucoa poseída por la demandante y la deman-

sec. 1631) dispone específicamente que "La servidumbre es un gravamen impuesto sobre un inmueble *en beneficio de otro perteneciente a distinto dueño*". (Énfasis suplido.) Aclara Manresa que las servidumbres "jamás pueden surgir sobre cosas poseídas en condominio. Un camino que cruza diversos predios indivisos, siquiera sea absolutamente necesario al servicio y explotación del fundo, no representará ciertamente para los copropietarios una servidumbre recíproca, pues ésta no se concibe sino en fundos pertenecientes a dos o más dueños, y actuando siempre en provecho de uno de aquéllos; el camino se reputará, por tanto, común, y los condóminos lo poseerán a título exclusivo de copropiedad". 3 Comentarios al Código Civil Español, 7ma ed., 1952, pág. 508. Véase, además, Velázquez, Los Derechos Reales Principales, 1937, pág. 218; Texidor y Alcalá del Olmo, Servidumbres, 2 Rev. Jur. U.P.R. 159, 162–163 (1932). Tampoco surge la ocasión de examinar en este recurso las relaciones entre la finca poseída en común por las partes y los demás predios que

518

dada en común proindiviso y en la proporción que a cada una corresponde, hay establecida una vía ferroviaria propiedad de la demandada Antonio Roig Sucesores, S. en C. la que usa y disfruta para beneficio propio así como también para beneficio de la propia finca donde está establecida cruzando dicha finca de un extremo a otro y la que había sido construida desde antes de celebrarse el contrato de arrendamiento otorgado a virtud de escritura Núm. 28 de 7 de abril de 1932 otorgada ante el Notario Francisco González Fagundo.

"5. Que al finalizar el contrato en junio de 1947 y haber entrado la demandante en posesión de su participación indivisa de dicha finca y de la proporción indivisa correspondiente a la demandada Antonio Roig Sucesores, S. en C., la demandante no objetó el establecimiento de la vía ferroviaria y por el contrario se sirvió de la misma ya que la finca se usa primordialmente en la siembra y cultivo de cañas de azúcar, teniendo asignada una cuota por la cual recibe compensación la persona que cultiva dicha finca.

"6. Que la finca de 111.60 cuerdas en la actualidad está arrendada a don Luis Vila Santana quien paga un canon de arrendamiento de $25 por cuerda al año y las contribuciones y quien satisface dicho canon de arrendamiento por motivo de la existencia de dicha vía ferroviaria que facilita el arrastre de la caña.

"7. Que con motivo del establecimiento de la vía ferroviaria no se ha causado daño de clase alguna al inmueble y por el contrario se ha facilitado el arrimo y arrastre de la caña de azúcar que se produce en dicha finca y se ha facilitado la transportación de abonos y materiales de cultivo, habiéndose instalado dicha vía ferroviaria desde antes del año 1921."

la rodean, ya que no hay alegación y mucho menos prueba de tales relaciones, y la acción se trae por un condómino contra el otro, sin que los dueños de los predios últimamente mencionados sean, en modo alguno, partes en el procedimiento. No hay, por consiguiente, base para declarar que la finca poseída en común se ha constituido en predio sirviente de otra u otras fincas. Véase a este respecto el art. 533 del Código Civil (31 L.P.R.A. sec. 1824) que exige el consentimiento de todos los copropietarios para que pueda imponerse una servidumbre sobre un fundo indiviso, y *Serrano* v. *Central Cambalache,* 23 D.P.R. 655 (1916). Además, la servidumbre de vía férrea, por ser discontinua y aparente, sólo puede adquirirse mediante convenio escrito. Art. 475 del Código Civil, 31 L.P.R.A. sec. 1653; *Picón* v. *Central Cambalache,* 48 D.P.R. 510, 519 (1935) y casos allí citados. Cf. *Pabón* v. *Ayala,* 71 D.P.R. 938, 941 (1950).

Fundado en esas conclusiones, el juez sentenciador resolvió, como cuestión de ley, que al mantener la demandada una vía ferroviaria sobre la finca que poseía en común proindiviso con la demandante, estaba ejerciendo un derecho al amparo del art. 328 del Código Civil vigente,([2]) sirviéndose de la cosa "conforme a su destino" y sin perjudicar el interés de la comunidad; que al establecer dicha vía la demandada lo hizo con el consentimiento tácito de la demandante y de acuerdo con el art. 331 del mismo Código; y que dicha vía mejoró la finca. Por tales motivos dictó sentencia declarando sin lugar la demanda.

La demandante interpuso apelación contra esa sentencia y en su alegato señala varios errores que, a su juicio, cometió el tribunal de instancia. En síntesis sostiene que la vía no se estableció con el consentimiento de la demandante; que la vía ha causado daños a la comunidad y que la demandante no se beneficia de ella; y que el citado art. 328 no autoriza la acción realizada por la demandada.

El art. 331 de nuestro Código Civil (31 L.P.R.A. sec. 1276) dispone que "ninguno de los condueños podrá, sin consentimiento de los demás, hacer alteraciones en la cosa común, aunque de ellas pudieran resultar ventajas para todos." Esta es una de las reglas fundamentales que con carácter supletorio de los acuerdos de las partes (art. 326) provee el Código para el gobierno de la comunidad. Se explica como parte de un plan que: (1) autoriza a cada partícipe a servirse de las cosas comunes conforme a su destino y sin perjudicar el interés de la comunidad ni impedir su uso por los otros copartícipes (art. 328); (2) autoriza a la mayoría que represente la mayor cantidad de intereses a tomar acuerdos para "la administración y mejor disfrute de la cosa común", los cuales serán obligatorios para todos (art.

_____

([2]) "Cada partícipe podrá servirse de las cosas comunes, siempre que disponga de ellas conforme a su destino y de manera que no perjudique el interés de la comunidad, ni impida a los copartícipes utilizarlas según su derecho." 31 L.P.R.A. sec. 1273.

332($^3$)); y (3) autoriza a hacer alteraciones en la cosa común con el consentimiento de todos los condueños (art. 331). Es, en consecuencia, un plan de concesión gradual de autoridad sobre la cosa común en razón de la severidad de los efectos que en ella y en los derechos de los copartícipes puedan tener las diversas actuaciones de uno o de algunos de ellos. Y es evidente, desde luego, que aun cuando sea difícil a veces encasillar exactamente los actos de los condóminos en uno de estos apartados, se trata siempre de tres categorías autónomas y exclusivas, con perfiles, procedimientos y resultados jurídicos diferentes, aunque dirigidas todas a mantener un régimen integrado, pacífico y equitativo de la comunidad.

Debemos, por tanto, resolver si el establecimiento por un condómino de una vía férrea fija en una finca de cañas indivisa constituye un uso de la cosa común conforme a su destino, o un acto de administración, o una alteración de la cosa común. Debe recordarse que dicho acto apareja la conversión de una parte del terreno dedicado a cultivo (en este caso una cuerda y un cuadro) en una vía de transporte; el uso de ese terreno para el tránsito de personas, máquinas y vagones y para la transportación de cañas y de ciertos artículos; y que, además, requiere tomar medidas (limpieza, uso de yerbicidas, etc.) que aseguren el uso continuo y eficiente de la vía.

Nos parece claro que un acto de esa naturaleza y con tales consecuencias no puede considerarse como un uso de

---

($^3$) "Para la administración y mejor disfrute de la cosa común serán obligatorios los acuerdos de la mayoría de los partícipes.

"No habrá mayoría sino cuando el acuerdo esté tomado por los partícipes que representen la mayor cantidad de los intereses que constituyan el objeto de la comunidad.

"Si no resultare mayoría, o el acuerdo de ésta fuere gravemente perjudicial a los interesados en la cosa común, el Tribunal Superior proveerá, a instancia de parte, lo que corresponda, incluso nombrar un administrador.

"Cuando parte de la cosa perteneciere privadamente a un partícipe o a algunos de ellos, y otra fuere común, sólo a ésta será aplicable la disposición anterior." 31 L.P.R.A. sec. 1277.

la cosa común conforme a su destino que un condómino pueda realizar por su cuenta y sin intervención alguna de los demás. (⁴)

Ni el Código Civil nuestro ni el español proveen definición alguna de la frase "conforme a su destino", (⁵) pero la doctrina y la jurisprudencia aclaran eficazmente su contenido. Dicha frase limita la facultad de los condóminos de servirse de la cosa común a los usos fijados por la comunidad o admitidos generalmente para la cosa, ya fueren por su naturaleza o por "el uso del tráfico". 3 Manresa, *ob. cit.* pág. 541; Beltrán de Heredia, La Comunidad de Bienes en Derecho Español, 1954, pág. 232. Algunos ejemplos tomados de la jurisprudencia y la doctrina harán más precisa la anterior explicación: 1. Un condómino no puede por su cuenta roturar diversos trozos del terreno común para dedicarlos al cultivo de cereales, cuando el propósito de la comunidad es el de dedicar todo el terreno a pastos y leñas. (Sentencia del Tribunal Supremo de España de 21 de mayo de 1928, 183 Jurisprudencia Civil 821) ; 2. un copropietario no hace uso de la cosa común conforme a su destino cuando utiliza una bomba turbina de instalación definitiva como bomba de prueba. (*Chardón* v. *Laffaye*, 43 D.P.R. 650, 655 (1932) ; 3. "Los copropietarios . . . de un caballo de carreras no pueden servirse de él para labrar sus tierras o enganchar sus carros, pues . . . hacen un uso contrario al destino de la cosa." (III, 1 Puig Peña, Tratado de Derecho Civil Español, s.f., pág. 265) ; 4. No puede utilizarse una fuente

---

(⁴) En *Díaz* v. *Plazuela Sugar Co.*, 31 D.P.R. 27 (1922) aparentemente resolvimos lo contrario. Una lectura detenida de esa sentencia demuestra, sin embargo, que la vía se tendió a requerimiento de unos arrendatarios y con el beneplácito de parte de los dueños, que los arrendatarios continuaban en posesión de la finca, que no se les hizo parte en el pleito, y que en verdad lo que resolvimos fue que "en ausencia de una demostración de perjuicio a la comunidad, el derecho de acción para el levantamiento de esas vías pertenecería a los arrendatarios." (Pág. 29.) Debe entenderse revocada cualquier expresión contenida en dicha sentencia que sea contraria al criterio que hoy expresamos.

(⁵) Tampoco se definen los actos de administración y de alteración.

común sirviéndose del agua para usos no estipulados por los demás condóminos (3 Manresa, *ob. cit.* pág. 542) ; 5. no puede transformarse la casa en que se habita en casa de alquiler (II, 2 Colin y Capitant, Curso Elemental de Derecho Civil, 3ª ed., 1952, pág. 184). Nos parecen suficientes los anteriores ejemplos y explicaciones para dejar completamente aclarado que la instalación de una vía férrea fija en una finca de cañas indivisa y las necesarias consecuencias de ese acto, ya anotadas, no pueden de manera alguna catalogarse como un uso de la cosa común "conforme a su destino". Incidió, pues, en error la sala sentenciadora al resolver lo contrario.

Es también evidente que las descritas actuaciones tampoco pueden considerarse como actos de administración y de mejor disfrute. En la doctrina española es tal vez Puig Brutau quien con mano más certera traza el diseño jurídico de estos actos: "En términos generales cabe afirmar que los actos de administración son aquellos que se requieren para contrarrestar los efectos de la duración o transcurso del tiempo en el valor de las cosas; son, como se ha dicho, los que salvan el valor presente de una cosa, sin comprometerla para el futuro. Son, también, los que permiten que una cosa se incremente con un valor que las circunstancias permiten aprovechar sin necesidad de exponerse a un riesgo o de sufrir un quebranto. En todo caso, estimamos que la calificación de un acto de administración ha de tener lugar en atención a sus consecuencias para los condóminos y no a base de apreciar las cualidades que abstractamente le atribuya la jurisprudencia de conceptos", 3 Fundamentos de Derecho Civil, pág. 268 (1953). Y Castán propiamente explica que las dos características más importantes de tales actos son: (1) las de referirse meramente al aprovechamiento o conservación de la cosa o al empleo de las rentas; y (2) ser de resultados transitorios. Se apoya en Planiol para concluir que esos actos "tienen como carácter propio no

comprometer el porvenir sino por un tiempo corto, y ser por consiguiente, frecuentemente renovables". 2 Derecho Civil Español, Común y Foral (1957), pág. 351. El Tribunal Supremo de España tiene clasificados los siguientes como actos de administración: (1) las variaciones de labores, máquinas y aperturas de pozos en un negocio de explotación de unas minas—Sentencia de 8 de julio de 1902, 94 Jurisprudencia Civil 39; (2) el reparto de un dividendo pasivo entre los condueños para pagar deudas de la comunidad—Sentencia de 25 de mayo de 1927, 175 Jurisprudencia Civil 298; (3) el reparto del aceite obtenido de la aceituna recogida en una finca común—Sentencia de 22 de octubre de 1914, 131 Jurisprudencia Civil 487; (4) la prórroga de un contrato para el aprovechamiento de productos forestales de varias fincas poseídas en común—Sentencia de 30 de junio de 1897, 81 Jurisprudencia Civil 1307. No son actos de administración, y sí de dominio, los siguientes: (1) la roturación de diversos trozos del terreno común para dedicarlos al cultivo de cereales, cuando la comunidad era de pastos y leñas de la totalidad del inmueble—Sentencia de 21 de mayo de 1928, 183 Jurisprudencia Civil 821; (2) el abono de unas compensaciones libremente convenidas entre las partes—Sentencia de 20 de junio de 1917, 140 Jurisprudencia Civil 715 y (3) el arrendamiento de más de seis años, inscribible—Sentencia de 9 de junio de 1913, 127 Jurisprudencia Civil 647. Nos parece claro que el acto de instalar una vía férrea fija en un fundo indiviso dedicado al cultivo de cañas y los resultados de ese acto, no pueden clasificarse, a la luz de lo ya explicado, como un acto de administración o de mejor disfrute. [6]

---

[6] Beltrán de Heredia considera el concepto de "mejor disfrute" como uno "intermedio, delimitado, por un lado, por la simple administración, como acto de gestión; y de otro, por la alteración. Lleva consigo la realización de cambios o modificaciones que afectan el modo de disfrutar . . . pero que no llegan a producir alteración de la sustancia y naturaleza de la cosa". *Ob. cit.* pág. 311. Aun en la hipótesis de que

524

En consecuencia, debemos por eliminación de las otras dos categorías, y como se explicará inmediatamente, por su configuración jurídica, clasificar dicho acto como uno de alteración de la cosa común. Estos son actos de disposición material que "suponen la producción de un cambio en el uso y disfrute o en la sustancia e integridad de la cosa, que pueden modificar el destino y la naturaleza de ésta y que significa una extralimitación de las facultades que legalmente corresponden a cada propietario." Beltrán de Heredia, *ob. cit.*, pág. 279. Explican los comentaristas que una alteración significa un cambio en el destino de la cosa común o una modificación de la forma, la sustancia o la materia de la cosa (Beltrán de Heredia, *ob. cit.*, pág. 285); un cambio del estado en que los otros copartícipes creen que la cosa debe permanecer, o una distracción del uso a que éstos quieren que sea destinada (Fornari, en Beltrán de Heredia, *ob. cit.*, pág. 283); una desnaturalización del destino y servicio de la cosa indivisa (Manresa, *ob. cit.* pág. 598); un cambio de la esencia o forma de la cosa (7 Scævola, Código Civil, 4ta ed. 1943, pág. 396); una novedad que pueda modificar y limitar, y, sobre todo, perjudicar la condición o disfrute de la misma para los demás (3 Sánchez Román, Estudios de Derecho Civil, 2a ed., 1909, pág. 180); un acto que deba ser calificado jurídicamente como acto de disposición y que incluye los de simple intervención de hecho en la cosa común cuando puedan implicar para ésta alteraciones sustanciales (Puig Brutau, *ob. cit.* pág. 269); una obra que modifique la forma o sustancia (especialmente el destino) de la cosa común (2 Barassi, Instituciones de Derecho Civil, 1955, pág. 60); todo acto dispositivo o de gestión que modifique sustancialmente el estado de hecho o de derecho de la cosa de modo que después de él la cosa no pueda decirse que sea

esa interpretación fuese correcta, no se alteraría nuestra conclusión, porque según explica el propio autor citado, en los actos de mejor disfrute "tendrá que respetarse el destino de la cosa" y por ende no se incluirán actos que suponen una alteración de ella.

como antes era (1 Ruggiero, Instituciones de Derecho Civil, 4ta ed., pág. 589).

Los ejemplos que ya citamos al describir los actos de administración y de uso conforme al destino de la cosa ilustran, tanto en forma negativa como positiva, lo que la jurisprudencia y la doctrina reputan como alteraciones de la cosa común. A ellos pueden añadirse los siguientes: edificar en un terreno dedicado a cultivo; convertir en depósito de mercancías un barco destinado a transporte, o un local de vivienda en sala de espectáculos; talar los árboles de un monte para leña, en vez de obtener los frutos (Beltrán de Heredia, *ob. cit.* págs. 283-284). Y el Tribunal Supremo de España, en pos de proteger adecuadamente los intereses de todos los condóminos, resolvió en su sentencia de 25 de septiembre de 1896, 80 Jurisprudencia Civil 195, que al sustituirse un antepecho por un cierre de cristal privando así de algunas vistas a la calle a uno de los condóminos de un edificio, se realiza una alteración porque "aun cuando las alteraciones se limiten a más o menos ligeras modificaciones que no varíen el objeto y uso a que se dedica [la cosa común] tampoco pueden realizarse si con ello se causa perjuicio a la comunidad o impide a los partícipes usarla según su derecho" (págs. 198-199).

Lo anteriormente explicado sería suficiente para eliminar toda duda sobre el asunto sometido a nuestro dictamen. Conviene añadir, sin embargo, que hay en nuestro país consideraciones de excepción que confirman definitivamente lo ya expuesto. Estando la industria azucarera sujeta a extensa reglamentación federal y estatal, un cambio en la producción o en los procedimientos puede tener efectos de importancia sobre la economía de un fundo. Así en este caso la alteración realizada puede afectar la cuota de producción asignádale a la finca bajo la legislación federal o la compensación por arrastre y arrimo de las cañas que autoriza la ley local. Es evidente que un cambio que produce esos

resultados no puede depender de la voluntad de uno de los condóminos, ni de la mayoría de ellos, sino que requiere, por todos sus efectos sobre la cosa común y su economía, el consentimiento unánime.(⁷)

La doctrina de varios países ha discutido con alguna extensión el problema de si puede ser tácito el consentimiento que se exige para realizar alteraciones en la cosa común. Es prácticamente unánime el criterio de que sí puede serlo. En ésta como en tantas otras cuestiones, la vieja norma romana mantiene todavía completa eficacia y el tiempo ha confirmado su sabiduría.(⁸)

Manresa es quien con mayor claridad y extensión explica el asunto.

" . . . Pero, ¿será necesario que el condueño dé aviso previo a sus compañeros, no suponiéndose, de lo contrario, prestado el consentimiento? Entendemos que no. El Código Civil no lo manda, porque la sanción de los actos ejecutados por uno de los comuneros no se hace depender exclusivamente de que de modo previo avisase a aquellos quien realizó las obras, sino de que todos los copropietarios consientan lo hecho. Así es que no ya el consentimiento expreso, sino el tácito, debidamente probado, es suficiente en el asunto.

"Ello, no obstante, las responsabilidades del comunero, en cuanto a sus actos, no serán siempre las mismas en orden a los intereses de la comunidad. Si los otros condóminos eran sabe-

(⁷) Recuérdese que por disposición expresa del art. 331, es necesario obtener el consentimiento de todos los condóminos, aun cuando de las alteraciones "pudieran resultar ventajas para todos".

(⁸) Digesto, Libro X, Tít. III, Ley 28: "PAPINIANO: Cuestiones, libro VII.—Dice Sabino, que ninguno de los dueños puede hacer con derecho cosa alguna en la que es común, contra la voluntad del otro. Por lo cual, es evidente que hay derecho para prohibirlo; porque es sabido, que en igualdad de circunstancias es mejor la condición del que prohibe. Pero aunque en una cosa común puede prohibírsele a un socio por su consocio, que haga alguna cosa, sin embargo, no puede obligársele a que destruya la obra hecha, si cuando podía prohibirla dejó de hacerlo; y por lo tanto, podrá resarcirse el daño por medio de la acción de división de cosa común. Mas si prestó su consentimiento al que la hacía, no tiene acción ni aun por el daño. Pero si en ausencia del socio hizo alguna cosa en perjuicio de él, en este caso es obligado también a demolerla." 1 García del Corral, Cuerpo del Derecho Civil Romano, 1889, pág. 637.

dores de las obras, las cuales se ejecutaban a su vista, no podrán reclamar la demolición de lo hecho, si oportunamente no utilizaron las acciones ordinarias o extraordinarias encaminadas a este fin. Verdad es que no se podrá decir que existe un consentimiento expreso; pero, como decían los romanos, *is qui potest prohibiere et non prohibet, tacite consentire videtus,* 'quien pudiendo prohibir, no prohibe, consiente tácitamente'. En virtud de este tácito consentimiento, el condueño que hizo las obras carecerá de acción para reclamar los gastos, porque éstos no fueron ni pudieron ser materia del consentimiento presunto, ni los otros copropietarios tendrán derecho a la demolición de las obras que pudiendo impedir no impidieron; pero si hubiese sufrido daño la comunidad, de él podrá ésta resarcirse utilizando la acción correspondiente, y en su caso la de división de lo común contra el comunero que llevó a cabo las alteraciones. Esta teoría, que era la teoría romana, se funda en lo siguiente:

"1º Que el consentimiento tácito puede y debe presumirse en cuanto a la ejecución de las obras, las cuales, pudiendo impedirse, no se impidieron.

"2º Que ese consentimiento tácito no recae sobre los gastos de las obras, pues éstos los hizo el comunero en la manera y forma que creyó oportunas, sin consultar la voluntad de los demás, la cual podía haber sido contraria a su cuantía y al modo más o menos económico de sufragarlos; y

"3º Que si por actos imputables jurídicamente al comunero que por sí verificó las modificaciones en la cosa común se perjudicó a la comunidad, es justo que venga civilmente obligado al resarcimiento de los daños." 3 Manresa, *ob. cit.,* págs. 602–604.

En igual sentido de sostener la validez del consentimiento tácito se pronuncian Scævola,(⁹) Puig Peña,(¹⁰) Sánchez

---

(⁹) *Ob. cit.,* págs. 396–397:

"El consentimiento es la manifestación de la conformidad de una persona con el acto o contrato que se trate de realizar, debiendo ser expreso, esto es, consignado de modo directo e indubitado. ¿Quiere decir esto que no valdrá el tácito? No. Será más conveniente aquél; pero esto no implica la falta absoluta de eficacia del segundo, cuando esté demostrada su prestación. Si sabedores los condueños de la modificación de la cosa no se oponen a ella, y, por el contrario, permiten que se realice, es indudable que no podrán alegar la falta ·de consentimiento,

Román,[11] Beltrán de Heredia ( [12]) y Borrell y Soler.[13] Otros comentaristas españoles silencian el punto.[14] En Francia la jurisprudencia y la doctrina[15] aprueban el consentimiento tácito. De la misma manera opinan varios comentaristas italianos.[16]

Además, un fundamento eminentemente práctico valida la indicada solución. Si a la severidad de la regla que exige unanimidad de criterios para autorizar alteraciones en la cosa común, se añadiera el requisito de consentimiento expreso, con las formalidades que generalmente se requieren para que dicho acto conste con certeza y no esté sujeto a las contradicciones de la prueba oral, podría hacerse muy difícil el gobierno de la comunidad. Una solución que demande la unanimidad de voluntades pero que a la vez autorice la manifestación tanto expresa como tácita del consentimiento, ofrece a los condóminos la necesaria protección contra transformaciones o alteraciones unilaterales en la cosa común y a la vez permite una deseable flexibilidad en el procedimiento. Es este un caso en el cual el enfoque histórico-conceptual y el enfoque de intereses propugnan la misma solución. Por las

---

aunque no le hayan prestado de manera solemne. Sucede en esto lo que en la aceptación de la herencia. Hay la expresa y la tácita; la primera, la que se hace en documento público o privado; la segunda, la que se realiza por actos que suponen necesariamente la voluntad de aceptar, y una y otra producen efectos iguales. Consideramos, pues, que existe el consentimiento exigido por el artículo que comentamos: primero, cuando conste prestado en documento; segundo, cuando con conocimiento de la alteración que se esté realizando por uno o alguno de los condueños no exista acto obstativo de los demás referente a lo ejecutado."

[10] *Ob. cit.*, pág. 266, n. 20.

[11] *Ob. cit.*, pág. 180.

[12] *Ob. cit.*, págs. 289–293 y especialmente la 292.

[13] El Dominio Según el Código Civil Español, 1948, págs. 208.

[14] Véase: 2 Castán, *ob. cit.*, págs. 347–348; 3 Puig Brutau, *ob. cit.*, pág. 269; 1 De Diego, Instituciones de Derecho Civil Español, 1959, pág. 610; 2 Valverde, Tratado de Derecho Civil Español, 1925, págs. 256–259.

[15] 3 Planiol-Ripert, Tratado Práctico de Derecho Civil Francés, 1942, pág. 254; 10 Aubry y Rau, *Droit Civil Francais*, 1935, pág. 548; Colin y Capitant no discuten la cuestión—*ob. cit.*, págs. 183–185.

[16] Ruggiero, *ob. cit.*, pág. 588, n. 1.

razones señaladas, fallamos que el art. 331 del Código Civil vigente autoriza el consentimiento tácito para permitir alteraciones en la cosa común. Desde luego, en cada caso corresponderá a los tribunales determinar, a la luz de la prueba, si existe o no dicho consentimiento.

Los hechos probados demuestran, sin lugar a dudas, que en este caso la demandante consintió tácitamente al establecimiento de la vía ferroviaria. No consta de la prueba cuándo fue exactamente que la demandada instaló la citada vía en el condominio. Sí sabemos que un testigo, actual arrendatario de la finca, declaró sin ser controvertido que la vía estaba en la finca, "en las mismas condiciones" actuales desde 1918, año en el cual él llegó a Yabucoa; otro por la misma circunstancia la conoce desde 1921; el actual administrador de la demandada tiene noticia personal de la vía desde 1926; y el hijo de la demandante, y su único testigo, admitió que ellos sabían en 1937 que "existía". En la contestación a un interrogatorio servídole por la demandada y que constituye prueba admitida, la demandante aceptó que la finca había sido siempre poseída por ella y la demandada en común proindiviso, y que ella tenía conocimiento de la existencia de dicha vía "desde que la misma fue instalada". La prueba demuestra, además, que de 1932 a 1947 la demandante cedió su parte del condominio en arrendamiento a la demandada y en dos ocasiones la autorizó expresamente a establecer vías fijas y portátiles y a transportar por ellas cañas propias y de otras personas "sin tener que pagar nada por este concepto a su dueña"; que desde 1947 a 1952 la demandante arrendó la porción de la finca de la demandada y mantuvo y utilizó la vía; y que desde 1952 subarrendó toda la finca con la vía a otra persona, la cual también continuó utilizándola de la misma manera que se había usado antes. El testigo de la demandante declaró que al firmarse el contrato de arrendamiento con la demandada en 1947, se objetó y se obtuvo la eliminación de una cláusula, propuesta

por el Lic. González, abogado de la demandada, que autorizaba el establecimiento permanente de la vía. Este testimonio no elimina, desde luego, las actuaciones de la demandada de no impedir o prohibir el establecimiento de la vía con anterioridad a 1937, y de servirse de ella con posterioridad a 1947. Además, el administrador de la demandada negó enfáticamente que en ocasión alguna la demandada hubiese solicitado la remoción de la vía, y el Lic. González, declarando como testigo, afirmó que al redactarse la escritura de 1947 él no hizo advertencia alguna sobre la vía. La escritura de 1947 no menciona la vía en sitio alguno. El juez de instancia, en el uso de su responsabilidad de apreciar la prueba, resolvió que no habían existido tales objeciones o solicitudes.

La prueba demuestra, en resumen, que durante largos años la demandante tuvo conocimiento de la instalación de la vía y de los usos específicos que se le daban; que por quince años e instalada ya la vía, cedió en arrendamiento su porción indivisa de la finca a la demandada; que en una ocasión en su doble carácter de condueña y arrendataria, y durante varios años, se sirvió de la vía; que posteriormente subarrendó a otra persona la finca con la vía; y que nunca, hasta que interpuso la demanda, objetó o prohibió su instalación y uso. Entendemos que dadas las relaciones entre las partes, tales actos concluyentes nos colocan ante un caso de conocimiento tácito, según las explicaciones que del asunto ya dimos, y no ante un simple acto de tolerancia, como nos sugiere la recurrente. (17)

------

(17) No es necesario en este pleito resolver si el silencio por sí solo o la mera ausencia de prohibición cuando ésta pudo levantarse, constituyen, en todas las circunstancias, un caso de consentimiento tácito. Ese problema se dejará para mejor ocasión. Planteado un asunto de esta índole, el juez deberá atender a la totalidad de las circunstancias para dictar su fallo. Explica Ferrara:

"Adoptando el criterio objetivo, hay que aclarar que, no obstante el aparente significado de los términos ('expresa' y 'tácita'), cuyo uso parece ya consolidado y, de cualquier manera, es el más difundido, es manifestación expresa incluso la realizada con signos o gestos que equivalen al lenguaje, y, por el contrario, la manifestación tácita, mientras que no

 El fallo anterior, sin embargo, no resuelve totalmente el problema. Aclara, sin duda, que la demandante

puede reducirse en absoluto al silencio, puede consistir bien en hechos o actos, bien en verdaderas y propias declaraciones negociales de voluntad, pero con diverso contenido, que, sin embargo, permitan la deducción acerca de la existencia de otra voluntad negocial (p. ej., la declaración de novación de una obligación del de *cuius* hecha en nombre propio por el heredero vale como declaración tácita de aceptación de la herencia).

"Finalmente, es dudoso el criterio que haya de adoptarse para la determinación de la congruencia o no del comportamiento en las manifestaciones tácitas. Punto seguro para todos es el de que el hecho debe ser unívoco, es decir, incompatible con una voluntad contraria a la que del mismo se deduce. Además puede decirse también punto seguro—aunque menos precisado por una parte de la doctrina—éste: es necesario juzgar el comportamiento en su conjunto y a base de la totalidad de las circunstancias en las que se han producido. Pero la incompatibilidad con una diversa voluntad, ¿debe ser absoluta o basta que sea relativa? La primera tesis, demasiado rigurosa, haría difícil o imposible una manifestación tácita de voluntad. Es preferible la segunda, que parece adoptada por la propia ley; por ello es preciso juzgar del carácter concluyente o no de un dado comportamiento, a base de los conceptos predominantes en la vida de los negocios." El Negocio Jurídico, 1956, págs. 337–338.

Véanse, en general, 2 Puig Brutau, *ob. cit.*, págs. 81–90; 2 Savigny, Sistema del Derecho Romano Actual, 2da ed., págs. 291–298; García Montes, Formas de Manifestación de la Voluntad, 1 Revista Trimestral de Derecho Privado 5 (1924). Examínese, además, la luminosa sentencia del Tribunal Supremo de España de 24 de noviembre de 1943, 4 Jurisprudencia Civil (Segunda Serie) 417, escrita por su Magistrado Don José Castán, de la cual tomamos la siguiente cita:

"El delicado y tan discutido problema del valor jurídico de las abstenciones ha de ser enjuiciado con gran cautela, ya que, en principio, el silencio, por su propia naturaleza de hecho negativo, no puede ser estimado como expresivo de una voluntad; y si bien la doctrina científica moderna suele admitir que, en algunos casos, el silencio es susceptible de ser interpretado como asentimiento y, por ende, manifestación del querer, partiendo para ello de la sencilla idea de que el silencio puede servir de prueba o presunción de voluntad, o bien fundando aquella conclusión en la tesis de que puede ser el silencio fuente de responsabilidad sustitutiva de la voluntad, toda vez que las necesidades prácticas consagradas por el uso imponen enviar una respuesta a ciertas personas (sobre todo si se tienen con ellas relaciones seguidas de negocios), y si no se hace así, el silencio prolongado equivale a una falta, que puede estimarse ha de ser reparada tratando al que calló como si hubiese aceptado, es forzoso, de todos modos, tener en cuenta: 1º Que todavía no ha llegado la doctrina a establecer en esta materia fórmulas de general aceptación, suficientemente seguras y precisas que tengan, además, el debido acoplamiento a nuestro ordenamiento positivo; y 2º Que si se acepta, por la gran difusión que ha tenido y todavía conserva, el antiguo punto de vista de que el silencio vale como declaración cuando, dada una determinada rela-

no tiene derecho a exigir la remoción de la vía.(¹⁸) Queda por considerar, no obstante, la cuestión de si la comunidad sufrió daños, debido a la instalación y uso de la vía, de los cuales sea responsable la demandada, aun cuando hubiese actuado con el consentimiento tácito de la demandante. El juez de instancia concluyó que no hubo tales daños y que, por el contrario, la vía benefició a la finca. La recurrente impugna esa apreciación.

La prueba en autos demuestra lo siguiente:

1. La vía atraviesa la finca, tiene un ancho de nueve metros, y ocupa en total una cuerda y un cuadro de terreno cultivable que produciría 60 toneladas de caña y una ganancia de $4 por tonelada. Desde hacía por lo menos dos años la finca tenía asignada una cuota de caña, la producía completa y, por consiguiente, habría que dedicar el terreno de la vía a otros cultivos, si ésta no existiera. La prueba de la demandante no especificó los cultivos ni la ganancia que se obtendría de ellos, si alguna.

2. La gente pasa por la vía; la demandada riega yerbicida; y hay peligro de fuego por las chispas que puedan salir de las locomotoras. No se presentó prueba alguna de daños específicos por estos motivos.

---

ción entre dos personas, el modo corriente de proceder implica el deber de hablar, ya que si el que puede y debe hablar no lo hace, se ha de reputar que consiente, en aras de la buena fe (*qui siluit cuum loqui et debuit et potuit, consentire videtur*), será necesaria, para la estimación del silencio como expresión del consentimiento, la concurrencia de estas dos condiciones: una, que el que calle 'pueda contradecir', lo cual presupone ante todo que haya tenido conocimiento de los hechos que motiven la posibilidad de la protesta (elemento 'subjetivo'), y otra, que el que calle 'tuviera obligación de contestar', o, cuando menos, fuere natural y normal que manifestase su disentimiento, si no quería aprobar los hechos o propuestas de la otra parte (elemento 'objetivo')."

Véase, finalmente, la sentencia del mismo Tribunal de fecha 8 de junio de 1955, 51 Jurisprudencia Civil (Nueva Serie) 791, en la cual se examina el consentimiento tácito y la tolerancia en el asunto del cambio de destino de una cosa arrendada.

(¹⁸) La razón es evidente. Una vez consentida la alteración por todos los condóminos, ésta se convierte en parte de la cosa común y su eliminación sería un acto de disposición material que a su vez requeriría el consentimiento de todos.

3. Desde 1947 la demandante arrendó la porción de la demandada por un precio anual de $15 la cuerda([19]) y desde 1952 tiene subarrendada toda la finca a otra persona por un precio anual de $25 la cuerda, que es uno de los precios más "favorables" que se pagan en la zona.

4. El testigo de la demandante declaró que la vía perjudicaba la finca;([20]) tres testigos de la demandada, incluyendo el actual arrendatario de la finca,([21]) sostuvieron lo contrario. Este último criterio se apoya en las facilidades para el arrimo y arrastre de la caña, y para el envío de abonos y materiales de cultivo que la vía fija ofrece a la finca, y en el hecho de que si dicha vía no existiera, habría que establecer vías portátiles y conectarlas a otra vía fija ubicada a dos hectómetros de la finca.

Es evidente que la descrita prueba sostiene la conclusión del juez sentenciador en el sentido de que la demandante no probó que la instalación y mantenimiento de la vía hubiese causado daños a la cosa común. Por conocidísimas razones, no alteraremos esa apreciación de la prueba.([22])

■■■■■■ Debemos, finalmente, prestar atención a otro elemento de daños que surge de la prueba. Tanto el testigo de la demandante como el administrador de la demandada afirmaron que esta última utilizaba la vía, no sólo para

---

([19]) A este mismo precio había arrendado la demandante su porción de la finca a la demandada, con anterioridad a 1947.

([20]) Se basó el testigo en las razones señaladas en los apartados 1 y 2, supra. Además, la demandante intentó probar que en lugar de tener la vía fija, sería más ventajoso para los dueños de la finca recibir la compensación por arrastre y arrimo de caña que la ley vigente ordena a las centrales pagar a los colonos, pero no aportó los elementos específicos de prueba, relativos a esa finca en particular, que abonaran la mencionada conclusión.

([21]) El arrendatario, Sr. Luis Vilá, declaró que la vía "además de la calidad del terreno", fue uno de los factores que consideró para arrendar la finca.

([22]) No debe entenderse nuestro fallo como una aceptación de que la demandante podía obtener compensación *como cuestión de derecho* por todos los daños que, a su juicio, se le habían causado a la cosa común. Queda, por consiguiente, abierto a futura dilucidación, el problema de cuáles son los daños a la comunidad por los cuales responde un condueño cuando realiza alteraciones en la cosa común con el consentimiento tácito de los demás condueños.

servir las necesidades de la finca común, sino también para transportar anualmente miles de toneladas de caña procedentes de otras fincas[23] y que iban destinadas a la central propiedad de la demandada.

No hay duda que la demandada estaba impedida, por razón del art. 328 del Código Civil, de utilizar la cosa común, con o sin la vía, para su particular y exclusivo beneficio y sin pagar una adecuada compensación a la comunidad. Como explica el Tribunal Supremo de España, el condominio "consiste en el libre goce de [la cosa común] y de sus productos por todos los partícipes por igual o en proporción de sus respectivas participaciones, sin más limitaciones que las necesarias para lograrlo del modo mejor y más equitativo, y . . . excluye el disfrute exclusivo de la cosa común y de cualquier parte de ella en beneficio singular de uno de los condueños." Sentencia de 22 de junio de 1892, 71 Jurisprudencia Civil 805, 811–812. Este es, sin duda, uno de los principios rectores de un régimen pacífico y justo de la comunidad.[24]

Sin embargo, aunque la demandante probó que la demandada había utilizado la vía para ciertas actividades de su exclusivo beneficio, no aportó los indispensables elementos de prueba que hubiesen permitido al tribunal de instancia o a este Tribunal Supremo fijar la compensación por tales daños. *Boria* v. *The Maryland Casualty Co.*, 60 D.P.R. 830, 837 (1942); *Sánchez* v. *Cooperativa Azucarera*, 66 D.P.R. 346, 353 (1946). En efecto, el expediente sólo contiene las ya citadas afirmaciones sobre el número de toneladas de caña procedentes de otras fincas que para su particular ventaja la demandada hizo transportar por la vía de la comunidad. No tenemos datos de clase alguna que nos permitan hacer

[23] El testigo de la demandante estimó el total en 13,800 toneladas, el de la demandada dijo que serían "probablemente 10,000 ó 12,000 toneladas".

[24] Véase, además, la sentencia de 26 de junio de 1951, 35 Jurisprudencia Civil (Nueva Serie) 502; 3 Manresa, *ob. cit.* pág. 542; Puig Peña, *ob. cit.* pág. 271; Beltrán de Heredia, *ob. cit.* págs. 238–242; Scævola, *ob. cit.* págs. 312–321.

un cómputo de la suma que por ese servicio debió recibir la comunidad, tomando en cuenta, por ejemplo, la distancia recorrida y lo que se acostumbra cobrar en tales casos. Actuaríamos necesariamente sobre bases especulativas y arbitrarias si fijáramos la compensación sin evaluar esos elementos. No podemos, desde luego, hacer tal cosa.[25]

*Se confirmará la sentencia apelada.*

Opinión disidente del Juez Asociado Sr. Belaval.

El artículo 328 de nuestro Código Civil le permite a un partícipe "servirse de las cosas comunes siempre que disponga de ellas conforme a su destino y de manera que no perjudique el interés de la comunidad, ni impida a los copartícipes utilizarlas según su derecho". El artículo 331 dispone que "ninguno de los condueños podrá, sin consentimiento de los demás, hacer alteraciones en la cosa común, aunque de ellas pudieran resultar ventajas para todos".

Los hechos de este caso son los siguientes: la demandada apelada Antonio Roig Sucrs. S. en C. posee una participación indivisa de 13.25 cuerdas en un condominio de 111.60 cuerdas, siendo dueña del resto de dicho condominio la demandante doña Susana de la Fuente Beníquez. Sin convenio de clase alguna entre las partes (t. 67) la compañía demandada mantiene, a lo largo de la finca poseída en común, una vía férrea que utiliza para recoger cañas sembradas en la finca poseída en común y en otras fincas que no tienen nada que ver con dicha finca.

---

[25] En vista de este fallo, dejamos también de lado el problema de si la demandante hubiese tenido o no derecho a recibir compensación por las ya descritas actuaciones de la demandada, ocurridas desde la fecha en que la demandante tenía el control de la finca y en consecuencia de la vía, en su doble carácter de arrendataria y condueña, y cuando no realizó acto alguno, hasta la fecha de la presentación de la demanda, para prohibir o impedir la transportación de las cañas procedentes de otras fincas. Tampoco es necesario expresar criterio alguno sobre cuáles serían los derechos de las partes en caso de que se procediera a la división de la comunidad, ya que en la demanda no se solicita dicha división.

En la opinión de la mayoría, el Tribunal parece haber llegado a la conclusión que por haberse el condómino minoritario servido de la finca poseída en común, conforme a su destino y de manera que no perjudica el interés de la comunidad, ni impide a la copartícipe utilizarla según su derecho y haber realizado una alteración con el consentimiento tácito de la demandante, dicha vía no puede ser removida, a pesar de así haberlo solicitado el interés mayoritario dentro del condominio.

Es difícil creer que la instalación de un sistema de transporte terrestre sea el uso "conforme a destino" que autoriza el art. 328, que parte del supuesto de un uso natural, sin "alteración", tales como el aprovechamiento de agua, pastos, arboleda, minerales, cotos de caza en aquella parte no prevista por reglamentación especial y en los casos especiales de ejidos municipales y condominios horizontales. Es difícil creer que sea igual a un callejón de siembra de un fundo agrícola, el espacio que toma la operación de un tren de caña que pasa de una finca a otra. Es difícil creer que mantener abiertos dos lados de una finca para darle paso a un tren de caña, no perjudique los intereses de los condóminos mayoritarios ni le impida usar la finca según su derecho, incluso dedicándola a otros fines.

La prueba demuestra que por la vía tendida sobre la propiedad en común, la compañía demandada—condómina de menos de una décima parte—pasa las cañas de otras propiedades para molerlas en el ingenio azucarero, propiedad exclusiva de la compañía demandada. El propio testigo de la demandada Sr. Roig, admitió, que: "además de la caña que produce esa finca (la poseída en común) conduce por esa vía caña de otros colonos al otro lado . . . probablemente 10,000 ó 12,000 toneladas . . . y que para el uso de dicha vía . . . no existe ningún convenio". (t. 65–67.) La demandante por medio de un testigo, estableció, sin ser contradicha, que al lado de esa vía se ha constituído un camino, un camino

de la Yabucoa Sugar Company, (entidad ésta propiedad o bajo la operación de la condómina minoritaria aquí demandada) : que la finca ha perdido "privacidad"; que en realidad no hay control y los empleados de las otras heredades entran y salen de la misma cuando les da la gana; que por la finca poseída en común pasan máquinas, toda clase de máquinas; incluso las que riegan yerbicidas para matar el pasto de la vía. No hay duda, pues, que la función que desempeña la finca poseída en común, en cuanto a las otras fincas que entran en el negocio de la condómina minoritaria, es una de predio sirviente, sin convenio verbal siquiera del interés mayoritario del condominio. Como se ve, no está tan exenta de mérito, como ha decidido la mayoría de este Tribunal, la acción de negatoria de servidumbre traída por la condómina mayoritaria.

Asumiendo, aunque sin resolverlo, que el uso de la faja de terreno por donde pasa la vía férrea explotada por un solo condómino minoritario, fuera una "alteración" como a la que se refiere el art. 331, que podría validarse mediante el consentimiento tácito, se trataría indudablemente de un *acto de administración* para el mejor disfrute de la cosa y y no de un *acto de enajenación* que participa del carácter de una servidumbre en favor de un interés minoritario. Creo que no puede existir duda que cualquier acto de administración no importa el grado de asentimiento tácito que lo acredite, es esencialmente transitorio y basta que el interés de la mayoría en un condominio se manifieste en contra de su continuación, para que quede automáticamente revocado. Habría que determinar además si el acto de administración afecta a la sustancia o forma de la cosa. 2 Castán—Derecho Civil Español, Común y Foral—348–349 y 350–351 (novena edición de la Editorial Reus de 1957). No hay duda que la instalación de una vía férrea que crea un gravamen o uso contrario al disfrute general o limitado al beneficio del disfrutante o que convierte una finca cerrada

en una finca abierta, afecta tanto a la sustancia como a la forma de la cosa poseída en común.

La opinión de la mayoría no nos habla sobre el carácter del derecho de paso o de vía que ha creado el consentimiento tácito sobre la propiedad poseída en común. Es indudable que un derecho de vía, cualquiera que sea la relación jurídica dentro de la cual se establece, constituye, por lo menos, un gravamen, que participa del carácter de una servidumbre. Tan es así, que el Tribunal se ha negado a remover la vía como si se tratara de un derecho real establecido sobre la cosa.

La ley prohibe el establecimiento de una servidumbre sobre un fundo indiviso sin el consentimiento expreso de todos los copropietarios—art. 533—. Por eso Castán incluye entre las limitaciones del derecho de los comuneros con relación a su porción o cuota, la de no imponer "servidumbre sobre un fundo indiviso sin consentimiento de todos los copropietarios" —pág. 349. Igual actitud debemos adoptar ante un derecho de vía y un derecho de paso que, en alguna forma, participe del carácter de una servidumbre. No hay que pensar que un consentimiento tácito sea suficiente para el establecimiento de un derecho real de servidumbre discontinua bien sea de paso o de vía férrea pues se trata de un derecho que no se adquiere por prescripción o mera tolerancia y necesita título escrito. Art. 475—31 L.P.R.A. 695, sección 1653.— Véase la glosa de nuestra jurisprudencia citada a las págs. 696–698. Igual actitud debemos adoptar ante un derecho de goce o disfrute que participe del carácter de una servidumbre. Me siento relevado de la obligación de discutir la diferencia que existe entre una mejora y una servidumbre.

Resumen: Si se trata de una mera autorización verbal para el aprovechamiento particular de un condómino minoritario de parte de la finca poseída en común, la misma es esencialmente transitoria y basta la expresión de la voluntad

del interés mayoritario en el condominio para que termine la autorización, aunque resulte ventajosa para todos: art. **331.** Si se trata del establecimiento de un derecho real que participa de la naturaleza de una servidumbre necesita del consentimiento expreso de todos los copropietarios: art. **533.**

*Por las razones expuestas lamento tener que disentir.*